**STATE of Minnesota, Respondent,**

v.

**Dan HARDY, Appellant.**

No. C6–83–552.

Supreme Court of Minnesota.

Aug. 31, 1984.

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Johnson, Hennepin County Atty., Minneapolis, for respondent.

KELLEY, Justice.

Defendant was found guilty by a district court jury of aggravated robbery, burglary of an occupied dwelling, and assault in the second degree, Minn.Stat. §§ 609.245, 609.-58, subd. 2(1)(b), 609.222, 609.05, and 609.11 (1982). The trial court sentenced defendant to an executed term of 90 months in prison for the burglary.[1] On appeal, defendant contends (1) that his convictions should be reversed outright because the evidence connecting him to the crimes was legally insufficient, or (2) that at least he should be given a new trial because the trial court prejudicially erred in admitting certain hearsay evidence connecting defendant to the crimes. We affirm.

At 4 a.m. on April 17, 1982, four men described as American Indians used deception and force to gain entry to a south Minneapolis house, threatened the three occupants with guns, bound the occupants with lamp and telephone cords, and ransacked the house, taking silverware, jewelry, and money when they left. The residence had been burglarized 3 or 4 weeks earlier, but the burglars had been scared away. The victims felt that there might be some connection between these men and the prior burglary because the men went almost immediately to the closet where guns were kept and used those guns during the incident, which lasted approximately 45 minutes.

One of the victims, an elderly woman, died before trial of unrelated causes. Although the jury did not have the benefit of her testimony, it learned that she did not identify defendant. Her husband and her adult daughter, the other victims, both told the police that they thought they could identify one or two of the four men. Subsequently shown a photographic display of eight men, they both selected pictures of Charles Robinson and Randall Lamere. They did not select pictures of defendant and another suspect, Leslie Robinson.

Defendant was arrested on April 30 in Bemidji near his mother's home after a high-speed chase. A search of the residence of his girlfriend in the Twin Cities failed to recover any of the stolen property. In fact, none of the stolen property was ever recovered.

The key evidence against defendant at his trial was the testimony of two fingerprint experts, who identified as defendant's a latent fingerprint found on the kitchen knife apparently used by the assailants to cut the lamp and telephone cords. The knife in question was one that the victims used two or three times a week, always washing it and putting it in a kitchen knife rack after each use. There was expert testimony that washing would destroy any prints. The victims had no reason to believe that the knife had been touched by the burglars who entered the house several weeks earlier since the knife was still in the rack after the burglary. As far as the victims knew, the knife was clean and in the knife rack before the men entered on the 17th. After the incident on the 17th,

---

1. The burglary offense is a severity level VII offense. Defendant had a criminal history score of two at the time of sentencing. The presumptive sentence for a severity level VII offense by a person with defendant's criminal history score normally is an executed term of 41 (38–44) months in prison. However, in defendant's case a minimum term of 3 years was involved, which at the time translated into a presumptive sentence of 54 months pursuant to Minnesota Sentencing Guidelines and Commentary, II.E. (1982). The trial court's sentence, which constituted a durational departure, is not challenged on appeal.

the police found the knife on the floor in the foyer by the stairs to the second floor. The latent print was found at the top of the knife blade near the handle. It was a partial print, as most latent prints are, in this case approximately 20% to 33% of the size of a complete print. All points available for comparison, 21 in all, matched the same points on the known print. There were no unexplainable differences. Both experts believed that the latent print was defendant's.

The claim of trial error relates to evidence that the investigation focused on defendant, the two Robinsons, and Lamere after the police received their names from a reliable informant. The evidence was adduced by the prosecutor in his direct examination of the police lieutenant who investigated the incident. The prosecutor asked the officer if he determined if there were any suspects, and the officer testified that there were four suspects, defendant, the two Robinsons, and Lamere. Defense counsel objected on hearsay grounds when the prosecutor asked the officer how he obtained that information. The trial court ruled, "Well, the contents of conversations cannot be properly elicited, but I think the witness can tell us if he learned it from some other person or how he learned it in that sense without telling what [he] learned exactly." The officer replied that he learned the information from a "reliable informant." A short time later the prosecutor asked him if he put together a photographic display on the basis of the limited physical descriptions he received from the victims and the information obtained from the "reliable informant," and the officer said yes. The officer then testified about showing the photographic display to two of the victims and about their identifying Charles Robinson and Randall Lamere. The prosecutor then focused his questions on the fingerprint found on the knife, eliciting evidence that the officer had requested the Bureau of Identification to compare the print on the knife with the known prints of defendant, the two Robinsons, and Lamere. The prosecutor then asked, "Are those the four names given to you from your—" at

which point defense counsel again objected and requested the striking of the "entire use" of the hearsay evidence. The trial court ruled that "In the form in which the question is asked the objection is well taken," then added, "If you wish to restate it, I think you can do the same thing perfectly properly." The prosecutor proceeded to elicit testimony that the officer gave the Bureau of Identification the four names he had received from his "reliable informant." Defense counsel again objected but the trial court overruled the objection.

■ Following a recess, defense counsel raised the issue again, this time in chambers, arguing that the admission of the evidence violated defendant's right of confrontation and left the jury with the impression that somebody in the know gave the right names of the people who committed the crime. The result of the discussion that ensued was that the trial court gave a cautionary instruction as part of the final instructions, advising the jury that the evidence could not be considered in determining defendant's guilt but could be considered only as explaining why the fingerprint comparisons were made.

1. Defendant's first contention is that the evidence of his guilt was legally insufficient. He bases this argument on the fact that none of the victims identified him. We do not believe that their failure to identify him precluded his conviction. The two victims who testified stated that they felt after the incident that they might be able to identify one or two of the men, and both did identify two, Charles Robinson, positively, Randall Lamere, less than positively. Neither testified that defendant was not there; they simply said that they could not identify him as one of the four who was there. Although there was not any eyewitness identification of defendant, there was identification evidence in the form of expert testimony by two witnesses that the print on the knife was defendant's print. Under the circumstances of the case—including the evidence that the knife was cleaned after each use, that it apparently was not touched in the burglary several

weeks earlier, and that it was in the knife rack when the men entered on the 17th—we believe that that evidence, by itself, was sufficient evidence to sustain defendant's conviction. *See State v. Turnipseed,* 297 N.W.2d 308 (Minn.1980) (upholding burglary conviction based solely on fingerprint evidence), and cases cited therein; *see also* Annot., 28 A.L.R.2d § 28 at 1150 (1953) (annotating cases upholding convictions based solely on fingerprint evidence). Here the main evidence was the fingerprint evidence, but there was also other evidence tending to support the conviction, including the fact that the robbers were American Indians, evidence that he had a girlfriend in the Twin Cities, and the evidence that he was arrested only after a high-speed chase. We conclude that the evidence was sufficient.

2. The more difficult issue is the one relating to the admission of evidence that the police focused their investigation upon defendant and the others after receiving information from a "reliable informant" naming the four.

Dean McCormick states:

In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.

McCormick On Evidence, § 249 at 734 (E. Cleary, 3rd ed., 1984) (footnotes omitted).

Minn.R.Evid. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In discussing the federal counterpart to our Rule 801(c), Louisell and Mueller comment as follows on the general issue presented in this case:

In criminal prosecutions, often the action of law enforcement agents would appear incomprehensible without evidence of information which had been given to them, and proof of what they have been told may be received for this purpose as against a hearsay objection. Once again, however, the trial judge often may (and sometimes must) exclude such proof where it contains accusations so damaging to the accused that the risk that the jury will consider the words for their truth outweighs their probative value as an explanation of official conduct.

4 D. Louisell & C. Mueller, Federal Evidence § 417 at 112–13 (1980). Judge Weinstein makes a similar comment, stating that "Rather than focusing on the technical question of whether a given statement is beyond the hearsay rule's scope or whether it qualifies as [an] exception, it would be more fruitful to concentrate on the hearsay dangers posed." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(c)[01] at 801–72 (1981).

Illustrative federal cases include *United States v. Gomez,* 529 F.2d 412 (5th Cir. 1976), and *United States v. Mancillas,* 580 F.2d 1301 (7th Cir.1978), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). In both cases, the courts found error in the admission of evidence of this sort but concluded that the error was not prejudicial. Relevant Minnesota cases include *State v. Ford,* 322 N.W.2d 611 (Minn. 1982), and *State v. Olkon,* 299 N.W.2d 89 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

 In this case the prosecutor attempted to use the contents of the tip to tie defendant to the others, two of whom had been identified by the victims, and to the crimes. That is, it appears that the prosecutor tried to use the evidence for a hearsay purpose. That was error. In fact, we believe that even a limited elicitation, for nonhearsay purposes, of general testimony that a tip had been received that led to

defendant's prints being compared with the latent print would have been unjustified in this case because the potential of the evidence being used for an improper purpose outweighed its very limited probative value. We conclude, however, that a reversal is not required. The trial court eventually realized that the prosecutor erred in eliciting the evidence and tried to correct the error by giving a limiting instruction. Since the trial court gave this instruction, which we presume the jury followed, and since the evidence connecting defendant to the crime included highly reliable scientific evidence, we conclude that a new trial is not required.

Affirmed.